## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

CODY WRIGHT                                          CIVIL ACTION

VERSUS                                              NO.  13-5063

VENETIA MICHAEL, WARDEN,                             SECTION "E"(2)
DAVID WADE CORRECTIONAL CENTER

### REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DISMISSED WITH PREJUDICE** as time-barred, or alternatively, dismissed without prejudice for failure to exhaust state court remedies.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Cody Wright, is incarcerated in the David Wade Correctional Center in Homer, Louisiana.[2]  On January 10, 2008, Wright and two co-defendants, Clarence Hill and Kelvin Leagea, were indicted by a grand jury in Jefferson Parish on the charge of second degree murder.[3]   The Louisiana Fifth Circuit Court of Appeal summarized the facts of the case as determined at trial as follows:

> On November 7, 2007, Detective Solomon Burke of the Jefferson Parish Sheriff's Office (JPSO) was on Fredericks Street in Gretna when he heard two gunshots.  He got in his car and drove down Fredericks Street in the direction of the gunshots.  As he did so, he saw several people running near the intersection of Fredericks and Helen Streets.  The detective turned on Helen Street and saw that other detectives were already there.
> After Detective Burke learned that someone was shot in the doorway of 305 Helen Street, he started canvassing the neighborhood to locate evidence and witnesses.  While doing so, Detective Burke located Alfred Perry, Jr., age 16, who had information related to the case. . . .
>
>      *   *   *
>
> JPSO Detective Jeffery Rodrigue also responded to the scene. When he arrived, he saw the victim, later identified as Rolando Cuc Zerat, lying face down on the kitchen floor with a gunshot wound to the back.  Detective Rodrigue learned that, before being shot, Mr. Zerat was standing outside his residence at 305 Helen Street talking on his cell phone to his mother in Guatemala.
>
>      *   *   *
>
> Dr. Susan Garcia conducted the autopsy of Mr. Zerat and testified that the manner of death was homicide and the cause of death was a single, distant-range gunshot wound to his back.
> At trial, Alfred Perry, Jr., testified that at the time of the incident, he lived at 218 Helen Street with his father.  He also testified that defendant was his cousin, and that he had known defendant since they were young.  On November 7, 2007, shortly before 8:00 p.m., Mr. Perry was hanging out with his friend at his friend's house near the corner of Helen and Fredericks Streets.

---

[2]Rec. Doc. No. 1.

[3]St. Rec. Vol. 4 of 8, Indictment, 1/10/08.

At some point, Mr. Perry spoke to Mr. Leagea, while defendant and Mr. Hill were standing by the basketball goal in the middle of Helen Street. Mr. Leagea asked Mr. Perry if he wanted to get some Cisco, a type of alcohol, and Mr. Perry replied that he did. Mr. Leagea said he did not have any money to buy it, and Mr. Perry said he did not have any money either. Mr. Leagea then said, "well, let's go rob - rob amigo," which Mr. Perry explained was a Mexican. Mr. Perry said "no" because he "didn't want no part of it." He thought that defendant and Mr. Hill were close enough to hear that conversation.

Afterward, Mr. Leagea, Mr. Hill, and defendant walked off, but Mr. Perry did not see exactly where they went. However, Mr. Perry did see the three of them walk in the direction of the house of the "candy lady," who he explained sold candy and gave piano lessons. When Mr. Leagea, Mr. Hill, and defendant walked off, Mr. Perry was under the assumption that they were going to rob Mexicans for money to buy Cisco.

Mr. Perry then walked towards his house, but stopped to talk to Lisa Smith, his next-door neighbor. After Ms. Smith went inside, and while Mr. Perry stood in front of his door, Mr. Perry heard gunshots from the direction of Fredericks Street, the same direction he saw the three suspects walking towards. Mr. Perry subsequently saw Mr. Leagea, Mr. Hill, and defendant running down Helen Street toward his direction. He first saw Mr. Leagea, then Mr. Hill, and lastly, defendant. They were about 20 yards apart. As Mr. Leagea was running by Mr. Perry, he pointed a gun at Mr. Perry. Mr. Perry was scared, so he ran inside his residence. He eventually talked to the police about what he knew.

Clarence Hill testified for the State at trial that on November 7, 2007, he, Mr. Leagea, and defendant were at Mr. Leagea's sister's house watching a movie. Mr. Hill said his "baby needed money for the nursery," so they talked about robbing somebody. He admitted that the robbery was his idea. Defendant went upstairs to get a gun. When defendant came downstairs with the gun, Mr. Hill looked at it and touched it, and then gave the gun back to defendant. Defendant, in turn, gave the gun to Mr. Leagea who put it in his pocket.

The three of them left and walked down Helen Street. Before they got to the end of Helen Street, they ran into Mr. Perry "right where the basketball court used to be at, by the basketball goal." Mr. Leagea talked to Mr. Perry, but Mr. Hill did not overhear their conversation. While Mr. Leagea talked to Mr. Perry, defendant and Mr. Hill continued to walk. Mr. Leagea caught up to defendant and Mr. Hill shortly thereafter. The three of them crossed the street, and Mr. Hill observed the "Mexican" (the victim).

Mr. Hill testified that they walked to the candy lady's door as a set up, and they "played like they knocked" on her door while they were "setting the robbery up in motion." (The candy lady lived next door to the victim.) They did not actually knock on the candy lady's door. Mr. Hill responded affirmatively when asked if defendant was "in on that." Mr. Hill counted to three, and they all turned around. Mr. Leagea told the victim to give him the money. The victim tried to go inside and

3

suddenly Mr. Leagea fired two shots.  The victim hollered and fell in front of the door.  They did not take anything from the victim.

After the shots were fired, Mr. Hill, Mr. Leagea, and defendant ran to Mr. Leagea's sister's house where they were earlier.  When they got back to the house, defendant was laughing.  The police came and knocked on the door, but no one talked to them.  Mr. Hill left shortly thereafter, but defendant and Mr. Leagea were still there.

Mr. Hill testified that Mr. Leagea's sister threw the gun away, but Mr. Hill did not see her do that.  Five days later, the police picked him up and took him to the bureau where he was advised of his rights and gave a statement.  In that statement, Mr. Hill stated that defendant and Mr. Leagea were present with him during the planning and execution of the crime.  On September 22, 2008, Mr. Hill entered into a plea agreement with the State which required him to testify in court.

Elise Batiste testified at trial for the State that she lived at 301 Helen Street next door to the victim.  She further testified that she was home when the victim got shot, and that she had just gotten in bed around 8:00 p.m. when she heard the shots.  Ms. Batiste explained that she sold candy to children in the neighborhood . . .

* * *

Kelvin Leagea testified for the defense that on November 7, 2007, he lived at 221 Helen Street with his sister.  Mr. Leagea ran into Mr. Hill that morning, and they smoked marijuana.  Later in the day, they went to Mr. Leagea's sister's house.  That night, Mr. Hill told Mr. Leagea that he needed $200.00 for his baby's day care.  Mr. Leagea responded that they would get it some type of way.  Mr. Hill said the money for his baby's day care was due very soon, and Mr. Leagea asked Mr. Hill what he was going to do.  Mr. Hill said, "Man, we got to go jack something," and Mr. Leagea replied, "Cool."

Mr. Leagea and Mr. Hill walked towards the candy lady's house.  Mr. Hill said, "Hold on, let's stop right here and get this pistol."  Mr. Leagea saw Mr. Perry, and testified that defendant was there shooting baskets while Mr. Leagea was there.  Mr. Leagea told Mr. Perry that he and Mr. Hill were on a "jack mission."  Mr. Leagea claimed that defendant was at the candy lady's house by the time Mr. Leagea and Mr. Hill approached the house.  Mr. Hill said, "That's an amigo right there, we might as well get him while we got him."  Mr. Leagea responded, "Do what you got to do."

Mr. Hill told the victim to give him everything out of his pockets and said, "you already know what the deal is."  Mr. Leagea told Mr. Hill the victim was trying to run.  Mr. Hill then shot the victim twice in the back.  After the shooting, Mr. Hill, Mr. Leagea, and defendant ran.  Mr. Leagea claimed that Mr. Hill threw the gun to him while they were running.  He testified that defendant was "by the door" when everything occurred.  After Mr. Hill threw the gun, Mr. Leagea caught it and ran "towards the back."  As a result of this incident, Mr. Leagea was charged with second degree murder, but pled guilty to a reduced charge and received a 40-year sentence.

Mr. Leagea testified that defendant was with him and Mr. Hill at Mr. Leagea's sister's house before the incident, but that defendant left.  Mr. Leagea also testified that defendant did not have anything to do with the robbery, that defendant did not plan it, and that defendant did not get a gun for him.

Mr. Leagea contended that on November 12, 2007, when he got inside the interview room at the bureau, JPSO Detective Jason Barrette cursed, grabbed him by the shirt, and punched him in the mouth. He further contended that Detective Barrette punched him a second time and knocked him out. Mr. Leagea also stated that Detective Barrette pointed a gun at his face and told him he had better give a statement.  He said that while all of this was happening, he (Mr. Leagea) was yelling and screaming.

Mr. Leagea admitted giving a statement to Detective Barrette, but claimed it was not free and voluntary, and that he did not tell the truth.  He testified that he said what Detective Barrette wanted him to say, and that Detective Barrette wanted him to say that all three of them had something to do with the homicide. Mr. Leagea testified later that Detective Barrette beat him so he would say he was not involved in the homicide, and that only defendant and Mr. Hill were involved.

On cross-examination, Mr. Leagea read his statement to himself, but he testified that that did not help refresh his memory and that he did not recall giving it.  Mr. Leagea testified that, when he gave his statement, he knew that Mr. Hill had already implicated him in the robbery. The prosecutor then read portions of Mr. Leagea's statements into the record, and Mr. Leagea read his responses and answered questions.

When the detective asked him during his statement what happened, Mr. Leagea replied, "They was talking about jacking amigo for their money."  Mr. Leagea claimed that "they" referred to Mr. Hill. When asked by the detective why they wanted the money, Mr. Leagea replied, "They said they wanted the money because they know they be working so hard for their money and they be getting it every day and they wanted me to come along, sir."  Mr. Leagea again claimed that "they" referred only to Mr. Hill.

Mr. Leagea told the detective in his statement that he told "them" he did not want to go and walked off and that "they" kept calling him names.  Mr. Leagea also told the detective in his statement that he (Mr. Leagea) did not go to the candy lady's house.  He further told the detective in his statement that he was standing down the street the whole time while it happened. Mr. Leagea said in his statement that, "They said they were trying to rob him but he didn't want to give it up and they shot him." Mr. Leagea testified that he was referring to Mr. Hill and defendant in that statement, but that was not the truth.

Mr. Leagea told Detective Barrette in his second statement that defendant said to him they were about to go on a mission to "jack some amigos, you coming?" Mr. Leagea testified at trial that that was not true.  He admitted to the detective in that statement that he crossed the street with defendant and Mr. Hill. Mr. Leagea said in his statement that Mr. Hill and defendant must have seen the "Mexicans" and

"they the guys that got good vision of them." At trial, Mr. Leagea testified that Mr. Hill saw the "Mexicans," and that Detective Barrette told him to say that.

Mr. Leagea responded affirmatively in his statement when Detective Barrette asked him if the gun was given back to defendant and whether defendant threw it by Mr. Leagea's sister's fence. Mr. Leagea said in his statement that defendant came back and took the gun out of the trash. However, Mr. Leagea claimed at trial that he was referring to "Corey" and not "Cody," the defendant. He also said in his statement that defendant had told him earlier that day that he (defendant) "placed" the gun at his mother's house.

Mr. Leagea testified at trial that during the second statement, Detective Barrette had his gun on the table waiting for Mr. Leagea to "mess up," and that the gun was cocked. During the third statement, Mr. Leagea positively identified defendant in a photographic lineup as the person on the scene who was talking about robbing someone. Mr. Leagea testified at trial that he positively identified Mr. Hill in a photographic lineup after Detective Barrette pointed to Mr. Hill's picture.

Mr. Leagea testified that he indicated in his statement that he understood his rights, was willing to make a statement and answer questions without a lawyer, and that no promises or threats had been made to him and no pressure or coercion had been used against him.

Defendant, age 15 at the time of the incident, testified at trial that in November of 2007, he sometimes lived with his grandmother and his sister at his grandmother's house at 216 Helen Street. On November 7, 2007, defendant went across Helen Street to Mr. Leagea's sister's house about 3:00 or 4:00 p.m. to watch television and to help her with the children. At some point, Mr. Hill and Mr. Leagea came over and appeared to be "high." Mr. Hill said he needed to rob "something" to get his baby in day care.

Defendant said he did not go along with that and left, and that Mr. Hill and Mr. Leagea came out of the door behind him. Defendant went to the basketball goal in the middle of the street. He saw Mr. Perry and went over briefly talk to him. Mr. Hill and Mr. Leagea came up the street behind defendant, and Mr. Leagea started talking to Mr. Perry. Defendant was not sure what they were talking about, but he knew it was something about robbing somebody. Defendant left when Mr. Leagea and Mr. Perry started talking and went to the candy lady's house.

Mr. Hill and Mr. Leagea walked across the street with defendant. Mr. Hill and Mr. Leagea said, "That go the man right there to rob." Defendant went to the candy lady's house and knocked on her door. As defendant did so, he heard shots, but he did not see who fired them. After defendant heard the shots, Mr. Hill and Mr. Leagea ran, and defendant ran behind them. Defendant saw Mr. Leagea with a gun in his hand, so he assumed that Mr. Leagea shot the victim. The three of them ran to Mr. Leagea's sister's house.

The police eventually arrested him and brought him to the bureau. Defendant's mother came to the bureau shortly thereafter, and defendant gave a statement. Mr. Leagea walked in front of defendant and went through another door.

Defendant subsequently heard Mr. Leagea screaming. Defendant testified that he did not have anything to do with the victim's murder. He further testified that he did not help plan the robbery, nor did he give Mr. Hill or Mr. Leagea a gun. Defendant also stated that he did not try to rob the victim, nor did he say anything to him.

Defendant testified that Mr. Leagea went upstairs and gave his sister the gun to throw away. The next morning, defendant asked Mr. Leagea's sister if she threw it away, and she said, "Yeah." Defendant testified that that was not his gun and that he did not own one.

Defendant's statement to the police, which was played for the jury, was similar to his trial testimony. However, in that statement, the detective said, ". . . and they agreed to rob somebody? And you agreed to just walk down the street with them you said?," and defendant replied affirmatively.

Kim Wright, defendant's mother, testified that on November 12, 2007, the police came to her house and brought her to the detective bureau. She was present when the detective was questioning her son. While she was there, she heard a lot of noise, including screaming and cursing, from another room. Detective Rodrigue was not rude to or rough with her or her son.

Indiana Wright, defendant's sister, testified that on November 7, 2007, she was at her grandmother's house at 216 Helen Street where she was living. On that date, she first saw Mr. Hill and Mr. Leagea together that day around 12:00 p.m. Mr. Hill talked about needing to "hit a lick" to get his baby some Pampers. She saw that Mr. Hill had a black .38 caliber gun in his back pocket. When Ms. Wright saw that, she went to her mother-in-law's apartment. At 7:00 or 8:00 p.m., Ms. Wright left to go home and walked down Fredericks.

While she was standing at the corner of Helen and Fredericks Streets, she saw Mr. Hill and Mr. Leagea crossing the street. Ms. Wright thought that Mr. Hill and Mr. Leagea were just talking to the victim at first, but then the man with the black jacket shot the victim. Ms. Wright testified that when she saw Mr. Hill and Mr. Leagea earlier that day, Mr. Hill was wearing a black jacket, and Mr. Leagea was wearing a colorful jacket. After the shooting, Ms. Wright ran to her grandmother's house. She claimed that she did not see defendant on the scene of the shooting or anywhere else on Helen Street. Ms. Wright saw defendant when she got to Mr. Leagea's sister's house, and she also saw Mr. Hill and Mr. Leagea who came in after she did.

Lieutenant Luis Munguia testified for the State in rebuttal regarding booking photographs of Mr. Leagea taken in connection with Mr. Leagea's arrest on November 12, 2007 which were introduced into evidence at trial. The State later contended during closing argument that these photographs showed that Mr. Leagea did not have any marks on him, even though Mr. Leagea claimed that Detective Barrette punched him and knocked him out.

State v. Wright, 61 So.3d 88, 91-96 (La. App. 5th Cir. 2011); State Record Volume 3 of 8, Louisiana Fifth Circuit Court of Appeal Opinion, 10-KA-577, pages 3-12, February 15, 2011.

The proceedings against Wright were severed from those against the co-defendants.[4]  He was tried before a jury on September 28 through 30 and October 1 and 5, 2009, and was found guilty of the lesser offense of manslaughter.[5]

On December 4, 2009, the state trial court sentenced Wright to serve 25 years in prison at hard labor.[6]  At a hearing on March 4, 2010, the state trial court denied the motion to reconsider the sentence filed by Wright's counsel.[7]

On direct appeal to the Louisiana Fifth Circuit, Wright's appointed counsel asserted three errors: (1) The evidence was insufficient to support the verdict. (2) He was denied the right to present a defense when the state trial court limited his cross-examination of Detective Rodrigue. (3) The sentence of 25 years in prison was excessive.

---

[4]St. Rec. Vol. 4 of 8, Minute Entry, 7/16/08.

[5]St. Rec. Vol. 4 of 8, Jury Verdict, 10/5/09; Trial Minutes, 9/28/09; Trial Minutes, 9/29/09; Trial Minutes, 9/30/09; Trial Minutes, 10/1/09; Trial Minutes, 10/5/09; Trial Transcript, 9/30/09; St. Rec. Vol. 5 of 8, Trial Transcript (continued), 9/30/09; Trial Transcript, 10/1/09; St. Rec. Vol. 6 of 8, Trial Transcript (continued), 10/1/09; Trial Transcript, 10/5/09.

[6]St. Rec. Vol. 4 of 8, Sentencing Minutes, 12/4/09; St. Rec. Vol. 7 of 8, Sentencing Transcript, p. 8, 12/4/09.

[7]St. Rec. Vol. 4 of 8, Motion to Reconsider Sentence, 12/9/09; St. Rec. Vol. 7 of 8, Hearing of Motion to Reconsider Sentence, 3/4/10.

The Louisiana Fifth Circuit affirmed Wright's conviction and sentence on February 15, 2011, finding no merit in Wright's claims.[8]

The Louisiana Supreme Court denied Wright's subsequent writ application without stated reasons on September 30, 2011.[9]  His conviction and sentence became final 90 days later, on December 29, 2011, when he did not file a writ application with the United States Supreme Court.  Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

Wright's counsel filed an application for post-conviction relief with the state trial court on March 13, 2012, asserting the following claims of ineffective assistance of counsel:[10] (1) Trial counsel failed to subpoena a crucial and material witness. (2) Trial counsel failed to introduce Wright's medical records to establish that he lacked the ability to form the requisite criminal intent. (3) Trial counsel gave Wright and his family

---

[8]State v. Wright, 61 So.3d at 88; St. Rec. Vol. 3 of 8, 5th Cir. Opinion, 10-KA-577, 2/15/11.

[9]State v. Wright, 71 So.3d 283 (La. 2011); St. Rec. Vol. 8 of 8, La. S. Ct. Order, 2011-K-0560, 9/30/11; La. S. Ct. Writ Application, 11-K-560, 3/17/11 (filed by hand by counsel); St. Rec. Vol. 3 of 8, La. S. Ct. Letter, 2011-K-560, 3/18/11 (showing filed by hand by counsel 3/17/11).

[10]St. Rec. Vol. 3 of 8, Application for Post-Conviction Relief, 3/13/12.

unreasonable and unethical guarantees regarding his ability to earn an acquittal. (4) The collective errors of counsel contributed to the verdict.

After receiving a response in opposition from the district attorney, the state trial court denied the application on June 22, 2012, finding no merit in the claims under the standards set forth in Strickland v. Washington, 466 U.S. 668 (1984), and related state law.[11]  Wright's counsel obtained leave from the state trial court to file for review in the Louisiana Fifth Circuit by August 20, 2012.[12]  However, no writ application was ever filed in the appellate court.

Instead, on February 7, 2013, Wright's counsel filed a second motion for leave to file for review, which the state trial court denied as untimely on March 7, 2013.[13]  Wright did not pursue any further relief in the state courts.

II.    FEDERAL HABEAS PETITION

On July 10, 2013, Wright's counsel filed a petition for federal habeas corpus relief in which he asserts three (3) claims:[14] (1) Trial counsel was ineffective because he failed to subpoena Detective Jason Barrette after learning that the detective coerced a co-defendant to implicate Wright in the murder. (2) Trial counsel was ineffective in failing

---

[11]St. Rec. Vol. 3 of 8, Trial Court Order, 6/22/12; District Attorney's Response, 5/16/12.

[12]St. Rec. Vol. 3 of 8, Motion for Leave to File, 7/19/12; Trial Court Order, 7/20/12.

[13]St. Rec. Vol. 3 of 8, Second Motion for Leave to File, a2/7/13; Trial Court Order, 3/7/13.

[14]Rec. Doc. No. 1, pp. 5, 7 and 8.

to present petitioner's medical records to establish that he had Attention Deficit Hyperactivity Disorder and lacked the ability actively to participate in the crime. (3) Trial counsel was ineffective because he gave misleading and unethical guarantees to Wright and his family regarding his ability to earn an acquittal.

The State filed a response in opposition to Wright's petition, arguing that the petition was untimely filed and that the claims are unexhausted and, therefore, technically in procedural default.[15]

III.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[16] and applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Wright's petition, which was filed by Wright's counsel on July 10, 2013.[17]

---

[15]Rec. Doc. No. 6.

[16]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[17]Because Wright was represented by a lawyer who filed this petition for him, the "mailbox rule," under which the filing date for prisoners proceeding pro se is deemed to be the date when prison officials receive the pleading from the inmate for delivery to the court, Coleman v. Johnson, 184 F.3d 398, 401

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State argues both that Wright's federal petition is not timely filed and that his unexhausted claims are now in procedural default.  Wright's counsel argued that the petition was timely filed, but used an erroneous date for finality of Wright's conviction in his calculation.[18]  For the following reasons, the record before this court clearly reflects both that he has failed to exhaust state court remedies and that his federal petition was not timely filed.

IV.   EXHAUSTION OF STATE COURT REMEDIES

"A fundamental prerequisite to federal habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief."  Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998) (citing Rose v. Lundy, 455 U.S. 509, 519-20 (1982)); accord Preiser v. Rodriguez, 411 U.S. 475, 500 (1973); Nobles, 127 F.3d at 419.

_____

(5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995), does not apply. Thus, the actual filing date applies in this case.

[18]Record Doc. No. 1 (Petition at pp. 13-15, ¶ 18).

"A federal habeas petition should be dismissed if state remedies have not been exhausted as to <u>all</u> of the federal court claims." <u>Whitehead</u>, 157 F.3d at 387 (citing 28 U.S.C. § 2254(b)(1)(A); <u>Rose</u>, 455 U.S. at 519-20) (emphasis added).

"The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the <u>highest</u> state court." <u>Id.</u> (citing <u>Picard v. Connor</u>, 404 U.S. 270, 275-78 (1971)) (emphasis added). "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate review procedures. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>accord</u> <u>Duncan v. Walker</u>, 533 U.S. 167, 177-79 (2001).

"A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." <u>Whitehead</u>, 157 F.3d at 387 (citing <u>Picard</u>, 404 U.S. at 275-78). "This requirement is not satisfied if the petitioner presents <u>new legal theories</u> or <u>new factual claims</u> in his federal application." (emphasis added) <u>Id.</u> (citing <u>Nobles</u>, 127 F.3d at 420). It is not enough for a petitioner to raise the claims in the lower state courts, if they were not also specifically presented to the Louisiana Supreme Court. <u>See</u> <u>Baldwin v. Reese</u>, 541 U.S. 27, 32 (2004) (a

prisoner does not fairly present a claim to a state court if that court must read beyond a petition or brief, such as a lower court opinion, to find the claim).

To exhaust his claims in state court, Wright must fairly present the same claims and legal theories urged in his federal habeas petition to each of the state courts through the Louisiana Supreme Court in a procedurally proper manner, either on direct appeal or on post-conviction review.[19] However, Wright has not asserted any of his claims beyond the state trial court, where his ineffective assistance of counsel claims were denied as meritless on post-conviction review. His counsel did not file for review of these claims in Louisiana Fifth Circuit or the Louisiana Supreme Court. Thus, the claims presented in this court have <u>not</u> been exhausted.

The record discloses no good cause for Wright's failure to exhaust these claims, and this court can find none from its review of the record. <u>Rhines v. Weber</u>, 544 U.S. 269, 278 (2005) (dismissal is appropriate where no good cause is shown for the failure to exhaust). With regard to the failure to exhaust, I note that "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of

---

[19]Louisiana law allows a defendant to appeal his conviction to the appropriate appellate court and then seek review of that court's ruling in the Louisiana Supreme Court. La. Code Crim. P. arts. 912.1, 922; La. S. Ct. Rule X§5. The post-conviction process in Louisiana requires presentation of appropriate claims on the appropriate form in the state trial court. La. Code Crim. P. art. 925 et seq. Review of the trial court's ruling may be sought in the appellate court and the Louisiana Supreme Court by application for a writ of review. La. Code Crim. P. art. 930.6; La. S. Ct. Rule X§5; La. App. Rule 4-1 et seq.

attorney error.'" <u>Coleman v. Thompson</u>, 501 U.S. 722, 753 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986)); <u>Hall v. Thaler</u>, 504 F. App'x 269, 284 (5th Cir. 2012).  Therefore, counsel's failure properly to seek review in the state appellate courts does not provide a basis to excuse the failure to exhaust.

Where there is no good cause for the failure to exhaust, dismissal without prejudice to require Wright to exhaust available state court remedies is an appropriate result.[20]  <u>Pliler v. Ford</u>, 542 U.S. 225, 233 (2004) (quoting <u>Rose</u>, 455 U.S. at 510); <u>Whitehead</u>, 157 F.3d at 387.  In this case, however, the State has also argued that Wright's federal petition was not timely filed.  I find that the petition in fact was <u>not</u> timely filed and must be dismissed instead with prejudice for that reason, rendering the need for exhaustion unnecessary.

V.    <u>STATUTE OF LIMITATIONS</u>

The AEDPA requires a petitioner to bring his Section 2254 petition in most cases within one year of the date his conviction became final.[21]  <u>Duncan v. Walker</u>, 533 U.S.

---

[20]I also note that Wright is not entitled to a stay of these proceedings to permit exhaustion because no showing of good cause to provide that extraordinary relief has been made and because this is not a <u>mixed</u> petition presenting both exhausted and unexhausted claims. The Supreme Court has held that stay-and-abeyance is an extraordinary remedy not to be made readily available to a habeas petitioner. <u>Rhines</u>, 544 U.S. at 278. The <u>Rhines</u> Court cautioned that a stay-and-abeyance "should be available only in <u>limited</u> circumstances," (emphasis added), and is appropriate <u>only</u> when the district court determines that there was "good cause" for the failure to complete exhaustion of a mixed petition. <u>Id.</u>, at 277; <u>see also</u> <u>Pliler v. Ford</u>, 542 U.S. 225, 233 (2004). Based on this record, no stay is warranted.

[21]The statute of limitations provision of the AEDPA at 28 U.S.C. § 2244(d), provides for other triggers which do not apply here:

167, 179-80 (2001).  Wright's conviction became final on December 29, 2011, when he did not file a writ application with the United States Supreme Court.  Therefore, under a literal application of the statute, Wright had one year from that date, or until December 28, 2012,[22] to file his federal habeas corpus petition, which he did not do.  His petition must be dismissed as untimely, unless the one-year statute of limitations period was interrupted or otherwise tolled in either of the following two ways recognized in the applicable law.

First, the United States Supreme Court has held that the one-year statute of limitations period in Section 2244(d)(1) of the AEDPA may be equitably tolled only when the petitioner has pursued his rights diligently and rare or extraordinary circumstances exist which prevented timely filing.  Pace v. DiGuglielmo, 544 U.S. 408,

---

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of--

A. the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B. the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State actions;

C. the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;  or

D. the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

[22]2012 was a leap year with 29 days in the month of February.

418 (2005); Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999), cert. denied, 531 U.S. 1164 (2001); Cantu-Tzin v. Johnson, 162 F.3d 295, 299 (5th Cir. 1998); Davis v. Johnson, 158 F.3d 806, 810 (5th Cir. 1998), cert. denied, 526 U.S. 1074 (1999). Equitable tolling is warranted only in situations where the petitioner was actively misled or is prevented in some extraordinary way from asserting his rights. Pace, 544 U.S. at 418-19; Cousin v. Lensing, 310 F.3d 843, 848 (5th Cir. 2002).

Wright does not assert any reason, and I can find none, that might constitute rare or exceptional circumstances why the one-year statute of limitations period should be considered equitably tolled. I am aware that Wright's counsel failed timely to file for appellate review of the state court denial of his application for post-conviction relief. The record reflects that he did not request service of the order granting him until August 20, 2012 to file for review.[23] Instead, he waited several months, until October 2012, before inquiring about the motion or a ruling.[24] After waiting several more months, he obtained a copy of the ruling, and his subsequent efforts to seek review were too late.[25] Nevertheless, the Supreme Court has recognized that this type of "garden variety"

---

[23]St. Rec. Vol. 3 of 4, Motion for Leave to File, 7/19/12; Trial Court Order, 7/20/12.

[24]See St. Rec. Vol. 3 of 4, Second Motion for Leave to File, 2/7/13.

[25]Id.

17

attorney negligence does not provide a basis for equitable tolling.  See Holland v. Florida, 560 U.S. 631, __, 130 S. Ct. 2549, 2564 (2010).

The record does not demonstrate the kind of circumstances that might fit the restrictive boundaries of "exceptional circumstances" described in binding precedent. See Holland, 130 S. Ct. at 2574-75 (equitable tolling was warranted where attorney was more than negligent when he failed to satisfy professional standards of care by ignoring the client's requests timely to file a federal petition and in failing to communicate with the client over a period of years in spite of the client's letters); Hardy v. Quarterman, 577 F.3d 596, 599-600 (5th Cir. 2009) (equitable tolling was warranted where petitioner suffered a significant state-created delay when, for nearly one year, the state appeals court failed in its duty under Texas law to inform him that his state habeas petition had been denied, petitioner diligently pursued federal habeas relief, and he persistently inquired to the court.); United States v. Wynn, 292 F.3d 226 (5th Cir. 2002) (tolling warranted when defendant was deceived by attorney into believing that a timely motion to vacate was filed); Coleman v. Johnson, 184 F.3d 398, 402 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000) ("A garden variety claim of excusable neglect does not support equitable tolling."); Fisher, 174 F.3d at 715 (tolling not justified during petitioner's 17-day stay in psychiatric ward, during which he was confined, medicated, separated from his glasses and thus rendered legally blind, and denied meaningful access to the courts);

Cantu-Tzin, 162 F.3d at 300 (state's alleged failure to appoint competent habeas counsel did not justify tolling); Davis, 158 F.3d at 808 n.2 (assuming without deciding that equitable tolling was warranted when federal district court three times extended petitioner's deadline to file habeas corpus petition beyond expiration of AEDPA grace period).

In addition to equitable tolling, the AEDPA itself provides for interruption of the one-year limitations period, in stating that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2) (emphasis added). By its plain language, this provision does not create a new, full, one-year term within which a federal habeas petition may be filed at the conclusion of state court post-conviction proceedings. Flanagan, 154 F.3d at 199 n.1. The Supreme Court has clearly described this provision as a tolling statute. Duncan, 533 U.S. at 175-178.

The decisions of the Fifth Circuit and other federal courts have held that because this statute is a tolling provision, the time during which state court post-conviction proceedings are pending must merely be subtracted from the one-year limitations period:

> [Section] 2244(d)(2) provides that the period during which a properly filed state habeas application is pending must be excluded when calculating the one[-]year period. Under the plain language of the statute, any time that passed between the time that [petitioner's] conviction became final and the

time that his state application for habeas corpus was properly filed must be counted against the one[-]year period of limitation.

Flanagan, 154 F.3d at 199 n.1; accord Brisbane v. Beshears, 161 F.3d 1, 1998 WL 609926 at *1 (4th Cir. Aug. 27, 1998) (Table, Text in Westlaw); Gray v. Waters, 26 F. Supp.2d 771, 771-72 (D. Md. 1998).

For a post-conviction application to be considered "properly filed" within the meaning of Section 2244(d)(2), the applicant must "'conform with a state's applicable procedural filing requirements,'" such as timeliness and location of filing. Pace, 544 U.S. at 414 ("When a postconviction application is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)"); Williams v. Cain, 217 F.3d 303, 306-307 n.4 (5th Cir. 2000) (quoting Villegas v. Johnson, 184 F.3d 467, 469 (5th Cir. 1999)); Smith v. Ward, 209 F.3d 383, 384-85 (5th Cir. 2000). The timeliness consideration in Louisiana, for purposes of the AEDPA, requires application of a prison mailbox rule to state pleadings filed by a prisoner. Causey v. Cain, 450 F.3d 601, 604-05 (5th Cir. 2006).

A matter is "pending" for Section 2244(d)(2) purposes "as long as the ordinary state collateral review process is 'in continuance.'" Carey v. Saffold, 536 U.S. 214, 219-20 (2002); Williams, 217 F.3d at 310 (a matter is "pending" for Section 2244(d)(2) purposes until "'further appellate review [is] unavailable under [Louisiana's] procedures.'")

The phrase "other collateral review" in the statute refers to state court proceedings challenging the pertinent judgment subsequently challenged in the federal habeas petition.  Dillworth v. Johnson, 215 F.3d 497, 501 (5th Cir. 2000) (state habeas petition challenging a prior conviction in one county was other collateral review even though filed as a challenge to a second conviction in a different county); Nara v. Frank, No. 99-3364, 2001 WL 995164, at *5 (3rd Cir. Aug. 30, 2001) (motion to withdraw a guilty plea is "other collateral review").  A "pertinent judgment or claim" requires that the state filings for which tolling is sought must have challenged the same conviction being challenged in the federal habeas corpus petition and must have addressed the same substantive claims now being raised in the federal habeas corpus petition.  Godfrey v. Dretke, 396 F.3d 681, 686-88 (5th Cir. 2005).  Requests for document and transcript copies also are not other collateral review for purposes of the tolling calculation.  Osborne v. Boone, 176 F.3d 489, 1999 WL 203523 (10th Cir. Apr. 12, 1999) (Table, Text in Westlaw) (motion for transcript copies is not "other collateral review" for tolling purposes); Brown v. Cain, 112 F. Supp.2d 585, 587 (E.D. La. 2000), aff'd, 239 F.3d 365 (5th Cir. 2000); Gerrets v. Futrell, No. 01-3080, 2002 WL 63541 (E.D. La. Jan. 16, 2002) (Vance, J.); Jones v. Johnson, No. 01-CV-0115-G, 2001 WL 1006062, at *3 (N.D. Tex. Aug. 13, 2001) (petitioner should file application and then continue to gather transcripts); Grayson v. Grayson, 185 F. Supp.2d 747, 751-52 (E.D. Mich. Jan. 3, 2002) (delay in

receipt of transcript not required to file the application, does not warrant equitable tolling).

The one-year AEDPA statute of limitations period began to run in Wright's case on December 30, 2011, the day after his conviction became final under the AEDPA. The period ran for 75 days, until March 13, 2012, when his counsel filed the application for post-conviction relief in the state trial court.  The limitations period was tolled by that application while it was pending. Although the state trial court denied Wright's application on June 22, 2012, ordinarily providing him with only 30 days thereafter to seek review in the state appellate court, La. App. Rule 4.3, the state trial court granted Wright an extension of this deadline through August 20, 2012. Affording Wright the benefit of every doubt, I consider the application to have remained pending until August 20, 2012, the extended deadline set by the state trial court for seeking review in the Louisiana Fifth Circuit, a deadline which Wright did <u>not</u> meet.

Thus, the AEDPA statute of limitations period began to run again on August 21, 2012, and did so without interruption for the remaining 290 days of the AEDPA statute of limitations period, until June 7, 2013, when it expired. Wright had no other <u>properly</u> filed state court post-conviction or other collateral review proceedings pending during that time period.  His counsel's motion for leave to revive the appellate review period was <u>un</u>successful and was denied as untimely.  Thus, this motion, filed on February 7,

2013 and denied as untimely on March 7, 2013, did <u>not</u> afford any additional tolling of the AEDPA one-year statute of limitations.  Wright's counsel filed this federal petition on July 10, 2013, which was 33 days after the AEDPA statute of limitations expired on June 7, 2013.

Wright's federal petition was <u>not</u> timely filed and must be dismissed with prejudice for that reason.  Alternatively, should a reviewing court find grounds to extend the AEDPA limitations period in this case, which I do <u>not</u> see, Wright's petition should be denied without prejudice for failure to exhaust state court remedies.

<u>**RECOMMENDATION**</u>

For the foregoing reasons, it is **RECOMMENDED** that Wright's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE** as time-barred. Alternatively, the petition may be dismissed without prejudice for failure to exhaust state court remedies.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v.</u>

23

<u>United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[26]

        New Orleans, Louisiana, this    12th    day of December, 2013.

                                  JOSEPH C. WILKINSON, JR.
                           UNITED STATES MAGISTRATE JUDGE

---

[26]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.